United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ACCO BRANDS, INC. d/b/a KENSINGTON TECHNOLOGY GROUP,

Plaintiff,

v.

PC GUARDIAN ANTI-THEFT PRODUCTS, INC., et al.,

Defendants.
_____/

No. C 04-03526 SI

**ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT**

On September 9, 2005, the Court heard argument on plaintiff's motion for summary adjudication of infringement of U.S. Patent No. 6,553,794 and on defendants' motion for summary judgment of inequitable conduct and unenforceability. Having carefully considered the parties' arguments, and for good cause appearing, the Court hereby DENIES defendants' motion for summary judgment. The Court further DENIES plaintiff's motion for summary adjudication without prejudice to reconsideration after claim construction occurs.

**BACKGROUND**

Plaintiff, ACCO Brands, Inc. d/b/a Kensington Technology Group ("Kensington"), is the owner of two patents – U.S. Patent Nos. 6,553,794 ("the '794 patent") and 5,502,989 ("the '989 patent") – both of which cover devices for attaching a lock to a portable computer. These patents are very closely related; both patents derive from the same application, U.S. App. Ser. No. 138,634 (filed October 15, 1993). The '989 patent claims a device, however, while the '794 patent claims a method, albeit in different terms from the '989 patent.

Defendants, PC Guardian Anti-Theft Products, Inc., and Fellowes, Inc. (collectively, "PC Guardian"),

are the makers of the Notebook Guardian line of locks for laptop computers. In 2000, Kensington brought suit against PC Guardian, claiming that the Notebook Guardian infringed the '989 patent. Kensington ultimately lost on summary judgment. *See ACCO Brands, Inc. v. Micro Security Devices, Inc.*, No. C 00-2296 SI (N.D. Cal. Jul. 23, 2002), *aff'd* 346 F.3d 1075 (Fed. Cir. 2003). Kensington now claims that PC Guardian's product infringes the '794 patent. PC Guardian denies infringement and claims that the '794 patent is unenforceable because Kensington committed inequitable conduct before the Patent & Trademark Office ("PTO").

**1.     The '794 patent and the accused product**

The operation of the accused product is not disputed. *See* Dec. of Brian Smith in Support of Plaintiff's Mot. for Summary Adjudication ("Smith Dec."), Exh. B (attaching declaration of PC Guardian designer from prior litigation, which describes the operation of Notebook Guardian). The product consists of a cable attached to a lock. At the end of the lock is a rectangular metal protrusion, referred to as a "flanged tab structure," as well as a metal "hook arm." In the unlocked position, this hook arm sits inside the protrusion. When the key is turned, however, a cam inside the lock rotates, causing the hook arm to raise out of the protrusion. The hook arm, in its raised position, coupled with the rest of the protrusion, is larger than the security slot on the side of a laptop. Thus, when the protrusion is inserted into a security slot on the side of a computer and the lock is turned, the raised hook arm catches the inside of the security slot, preventing its release.

Kensington claims that the accused device infringes claims 1, 4, 5, 7, and 9 of the '794 patent. These claims read as follows:

> 1. A locking method for a portable electronic device, comprising the steps of:
>
>     engaging a generally rectangular security slot, having dimensions of about 3 mm x 7 mm, defined in a wall of the portable electronic device with a moveable locking member;
>     moving said locking member to a locked position relative to said security slot to configure said locking member in a locked configuration; and
>     maintaining said locked configuration by use of a pin proximate said locking member; wherein said pin extends into said security slot.
>
> 4.     The locking method of claim 1 wherein said locking member is coupled to a housing and further comprising the step of localizing said housing to an object other than to the portable electronic device.

2

5.   The locking method of claim 4 wherein said localizing step includes the step of associating a cable, coupled to said housing, to said object.

7.   The locking method of claim 1 wherein a lock secures said locking member into said locking position.

9.   The locking method of claim 7 wherein said lock is a keyed tumbler lock.

## 2.  Prosecution of the '794 patent

PC Guardian's claims of inequitable conduct stem from Kensington's failure to disclose U.S. Patent No. 2,530,560 ("the Young patent") in prosecuting the '794 patent. PC Guardian bases this argument on the important role that the Young patent played in a reexamination of the '989 patent.[1]

After the prosecution of the '989 patent, the primary examiner, Darnell Boucher,[2] conducted a reexamination of a number of claims of the patent. She rejected several of these claims because they were anticipated by the Young patent. Examiner Boucher later reconsidered this rejection, allowing the claims because Young "fails to teach a pin coupled through the house which extends into the security slot *after* the slot engagement member is in the locked position." Defendants' Mot. for Summary Judgment, Exh. C, at 16 (emphasis added). Examiner Boucher later reiterated this basis for distinguishing Young: "[T]he prior art fails

---

[1] The claim at issue in the previous litigation was claim 10 of the '989 patent, which reads as follows:

10. A locking system, comprising:

   a portable electronic device including an exterior wall defining a security slot;
   cable means for attaching to a first object other than to the portable electronic device;
   a housing, proximate to said electronic device and including a slot engagement member having a slot engaging portion provided with a locking member having a peripheral profile complementary to preselected dimensions of said security slot to thereby permit said locking member to extend into said slot, said slot engagement member being rotatable between an unlocked position wherein said locking member is removable from the slot, and a locked position wherein said locking member is retained within the slot;
   a pin, coupled through said housing, for extending into said security slot proximate said slot engaging portion when said slot engagement member is in said locked position to thereby inhibit rotation of said slot engagement member to said unlocked position; and
   means, coupled to said housing, for attaching said cable to said housing.

*See ACCO Brands, Inc. v. Micro Security Devices*, 346 F.3d 1075, 1076-77 (Fed. Cir. 2003).

[2] Until she was replaced by PTO Examiner Suzanne Barrett, Examiner Boucher also served as the primary examiner on the '794 patent. At some point in the prosecution of the '794 patent, a third name also appears: Examiner Darnell Jayne. Due to the identical first names, the Court assumes that Examiner Boucher and Examiner Jayne are the same individual; at oral argument, counsel represented that Jayne is the examiner's married name. For ease of reference, this Order refers only to Examiner Boucher.

3

to teach or make obvious a computer locking assembly having a locking member which is rotatable to a locked position after being placed through an opening in a computer . . . and *subsequently* a pin being place [sic] into the opening after the locking member is rotated to the locked position . . . ." Defendants' Mot. for Summary Judgment, Exh. D (emphasis added).

This determination by Examiner Boucher would later play a key role in the patent infringement action that Kensington brought against PC Guardian (then named Micro Security Devices) for infringement of the '989 patent. In affirming this Court's Order granting summary judgment to PC Guardian on the issue of infringement, the Federal Circuit relied on Examiner Boucher's determination: "the examiner and the applicant understood that the pin extends (actively) into the slot *after* rotation." *ACCO Brands, Inc. v. Micro Security Devices, Inc.*, 346 F.3d 1075, 1079 (Fed. Cir. 2003) (emphasis added).

Despite the fact that the Young patent was playing such a fundamental role in litigation over the '989 patent throughout the time that the '794 patent was being prosecuted, it is undisputed that Kensington never revealed the Young patent to the PTO in its prosecution of the '794 patent. Neither party presented any evidence concerning why Young was not disclosed to the PTO.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 states that summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. *Id.* The moving party need only point out to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S. Ct. at 2554.

4

The burden then shifts to the non-moving party to "designate 'specific facts showing there is a genuine issue for trial.'" *Id.* at 324, 106 S. Ct. at 2553 (quoting Rule 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986).

Summary judgment can be used to determine infringement. *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988). The moving party bears the burden of proving infringement by a preponderance of the evidence. *Mannesmann Demag Corp. v. Engineered Metal Products Co.*, 793 F.2d 1279, 1282 (Fed Cir. 1986). To establish infringement, every limitation in a claim as construed by the Court must be in the accused product, either exactly or by substantial equivalent. *Carroll Touch, Inc., v. Electro Mechanical Systems, Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993). A claim is literally infringed if the accused product is exactly the same as each element of the asserted claim. *Hi-Life Products, Inc. v. American Nat'l Water-Mattress Corp.*, 842 F.2d 323, 325 (Fed. Cir. 1986). Even if a product does not literally infringe it may infringe under the doctrine of equivalents. *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 21, 117 S. Ct. 1040, 1045 (1997). Doctrine of equivalents infringement is found where the accused product does not literally correspond to the asserted claim but does function in the same way and obtain the same result as the asserted claim. *Graver Tank & Manufacturing Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S. Ct. 854, 856 (1950).

"Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of 'candor, good faith, and honesty.'" *Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005). Inequitable conduct can occur through "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false information, coupled with an intent to deceive." *Id.* "A party asserting that a patent is unenforceable due to inequitable conduct must prove materiality and intent by clear and convincing evidence." *Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.*, 410 F.3d 690, 695 (Fed. Cir. 2005). "[I]nequitable conduct is a matter for the court, rather than for the jury to resolve . . . ."

5

*Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*, 351 F.3d 1139, 1146 (Fed. Cir. 2003); *see also Paragon Podiatry Laboratory, Inc. v. Kim Laboratories, Inc.*, 984 F.2d 1182 (Fed. Cir. 1993) ("A patentee has no right to a jury trial respecting the factual element of culpable intent as part of the defense of inequitable conduct.").

## DISCUSSION

### 1. Infringement

"Patent infringement is a two-step inquiry. First, the court must construe the asserted claim. . . . Second, the court must determine whether the accused product or process contains each limitation of the properly construed claims, either literally or by a substantial equivalent." *Freedman Seating Co. v. American Seating Co.*, -- F.3d --, 2005 WL 1903786, at *5 (Fed. Cir. 2005). While the first step is a question of law, the second is a question of fact. *Id.*

At the claim construction stage of the infringement analysis, a court "determines the scope and meaning of the patent claims asserted." *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002). A court's claim construction begins with the language of the asserted claims, and "ascribes claim terms the meaning they would be given by persons of ordinary skill in the art at the time of the invention." *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1283-84 (Fed. Cir. 2005).

Ordinarily in a patent case the parties go through a formal process of claim construction, including a hearing dedicated to defining the disputed claim terms.[3] In this case, however, Kensing-ton asserts that formal claim construction is not necessary and that the Court may find infringement based on the ordinary meaning of the claim terms. PC Guardian, for its part, has submitted a list of terms that it wants construed,[4] but has not strenuously objected to Kensington's early summary judgment motion. Nonetheless, the parties' briefs reveal

---

[3] Such a process was followed, for example, in connection with the earlier litigation concerning the '989 patent and the same accused device. Indeed, resolution of the earlier action turned on the claim construction order, as did the decision by the Court of Appeals.

[4] PC Guardian's list of claim terms includes the following terms: moveable locking member; moving said locking member; a locked position; relative to said security slot; a locked configuration; maintaining said locked configuration; use of a pin proximate said locking member; said pin extends into said security slot; coupled to a housing; localizing said housing; associating a cable . . . to said object; a lock; secures said locking member; and a keyed tumbler lock. Smith Dec., Exh. E.

6

a disagreement concerning at least two claim terms, and the Court has decided that further elaboration on the meaning of those terms would be useful.

PC Guardian raises two arguments against infringement of the '794 patent. First, PC Guardian argues that its invention does not include a "pin" that "maintain[s] [a] locked configuration." In support of its argument, it points to the Federal Circuit's decision in the previous litigation involving the '989 patent. There, after construing the phrase "a pin . . . to . . . inhibit rotation of [the] slot engagement member to [the] unlocked position," the Federal Circuit ruled that "the extension of the flanged tab into the slot has no effect on the pivoting or rotation of the hook arm to its locked position; instead, in the PC Guardian devices it is the cam, not the flanged tab structure, that inhibits movement of the hook arm." *ACCO Brands*, 346 F.3d at 1081. Kensington responds that the '794 patent is a separate invention from the '989 patent, and that the '989 patent did not differentiate between the "locked position" of the locking member and the "locked configuration" of the locking member, as the '794 patent does. Further, Kensington argues that the '989 patent used the language "*inhibit rotation* of [the] slot engagement member to the unlocked position," while the '794 patent uses the language "*maintaining* said locked configuration."[5]

Even assuming that the "flanged tab structure" can be deemed a "pin," it is not clear that it "maintains" the locked configuration of the accused product. While the flanged tab structure is a part of the locked configuration, the configuration appears to be "maintained" by the rotating cam, which controls whether the hook arm is engaged or disengaged, and thus, whether the accused product is in its locked configuration or not.

Unfortunately, the parties have not dedicated any briefing to the proper construction of "maintaining said locked configuration by use of a pin," instead devoting their discussion to whether the construction of the claims of the '989 patent applies to the claims in the '794 patent.[6] Given that the claims of the '794 patent use

---

[5] Kensington appears to contend that "locked position" is something different from "locked configuration," and that "inhibit rotation . . . to the unlocked position" is different from "maintaining said locked configuration." In the context of these patents, and particularly in light of the Federal Circuit's opinion on the '989 patent, it is hardly sufficient to rely on the "plain meaning" of these terms to reach such a result.

[6] The parties' discussion of these issues is muddied considerably by the fact that plaintiff's expert, David Dornfeld, had not even read the Federal Circuit opinion on the '989 patent before testifying in this case about the '794 patent. His failure to have done so is all the more surprising since Dr. Dornfeld was the same expert who testified on plaintiff's behalf in the '989 litigation and whose suggested construction of the '989 claim terms

different language than the claims of the '989 patent, the Court finds it prudent at this stage to request further briefing from the parties specifically addressing the proper construction of the above claim term.

PC Guardian's second argument against infringement concerns the construction of "extends into" in the limitation "wherein said pin extends into said security slot." PC Guardian claims that "extends into" must be given an active meaning based upon prosecution history estoppel. "The essence of prosecution history estoppel is that a patentee should not be able to obtain, through litigation, coverage of subject matter relinquished during prosecution." *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1577 (Fed. Cir. 1993). Prosecution history estoppel applies both to parent and grandparent applications, as well as to derivatives of those applications. *See Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990) ("The '912 patent is the result of a continuation-in-part application from the original '008 application, which led to the '251 patent. Hence, the prosecution history of the '251 patent . . . is relevant to . . . the '912 patent."). In response to this argument, Kensington asserts that prosecution history estoppel should not apply because the '794 patent uses the term "extends into," while the '989 patent used the term "extending."

PC Guardian's argument may have merit. The Federal Circuit explicitly found that the '989 patent included the limitation of a pin that "actively" extended. *See ACCO Brands*, 346 F.3d at 1079 ("[T]he examiner and the applicant understood that the invention requires that the pin extends (actively) into the slot after rotation."). The Federal Circuit's conclusion, however, was based, at least in part, on the use of the participle "extending." *Id.* at 1078. Thus, as above, the Court feels that it is wise to request further briefing on the proper claim construction of the term "extends into."

Because it finds that further briefing on claim construction would be useful, the Court denies plaintiff's motion for summary judgment without prejudice, and will proceed with claim construction. Claim construction will be limited to the terms identified above,[7] and will proceed according to the briefing schedule detailed at the

---

was rejected in the Federal Circuit opinion.

[7] At oral argument plaintiff's counsel expressed some frustration with defendants' failure to comply with the claim construction deadlines in the local rules. Specifically, defendants failed to meet the Patent Local Rule 4-1 deadline for submitting its list of claim terms for construction, instead submitting a list of terms almost three weeks after the deadline passed. Defendants also wholly failed to supply proposed constructions to those claim terms, as required by Patent Local Rule 4-2. In addition, defendants did not participate in the joint claim construction statement required by Patent Local Rule 4-3, and they did not even file a brief opposing Kensington's opening claim construction brief.

8

end of this Order.

**2.     Inequitable conduct**

"Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of 'candor, good faith, and honesty.'" *Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005). Inequitable conduct can occur through "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false information, coupled with an intent to deceive." *Id.* "One who alleges inequitable conduct arising from a failure to disclose prior art must offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO." *Id.*

Kensington admits that it knew of the Young patent and that it did not disclose the Young patent to the PTO. Thus, the Court must consider only whether PC Guardian has established materiality and intent by clear and convincing evidence.

**A.     Materiality**

Information is material to patentability when:

It is not cumulative to information already of record or being made of record in the application, and

   (1) it establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

   (2) it refutes, or is inconsistent with, a position the applicant takes in:
       (i) opposing an argument of unpatentability relied on by the Office; or
       (ii) asserting an argument of patentability.

*Purdue Pharma*, 410 F.3d at 696 (quoting 37 C.F.R. § 156(b) (2004)). Kensington argues that the Young patent was not material because it was cumulative to U.S. Patent No. 505,299 ("the Schneider patent"), which discloses a device that operates by spreading two or more locking legs apart with a retractable plug or plunger. Dec. of David A. Dornfeld in Support of Plaintiff's Opp. to Defendants' Mot. for Summary Judgment

---

Despite this default on the part of defendants, the parties' summary judgment briefs reveal that the two terms identified above require further elaboration. Given defendants' failure to respect the Patent Local Rule deadlines, however, the Court limits claim construction to the terms identified in this Order.

("Dornfeld Dec."), ¶ 3.

For two reasons, the Court rejects Kensington's argument and finds the nondisclosure of the Young patent to be material. First, it is not only prior art that Kensington failed to disclose. Rather, Kensington failed to disclose the impact that the Young patent had on the scope of the '989 patent. "Materiality is not limited to prior art but instead embraces *any* information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent." *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001) (emphasis in original). Kensington wholly failed to disclose the impact that the Young patent had on the construction of the '989 patent. The Federal Circuit has previously found that such collateral information can be material to patentability. *See Critikon, Inc. v. Becton Dickenson Vascular Access, Inc.*, 120 F.3d 1253, 1258 (Fed. Cir. 1997) (holding that patentee's failure to reveal litigation over patent was material to PTO).

This information was not cumulative; the record does not reflect that Examiner Barrett was ever informed of the prosecution history of the '989 patent or of the litigation over that patent. Clearly, a reasonable examiner would consider a prior examiner's interpretation of relevant prior art important, especially where that interpretation was likely to have a direct bearing on the scope of the invention described in a new patent.

The second reason Kensington's argument falls short is that it is contradicted by the actions of the patent examiners, both of whom found the Schneider patent to have a less expansive reach than the Young patent. In prosecuting the '989 patent, Kensington originally disclosed only the Schneider patent. After Examiner Boucher became aware of the Young patent, however, she conducted a reexamination of the '989 patent. Only after considering the Young patent did she emphasize the importance of temporal restrictions on the placement of the pin in the security slot, in order to distinguish the '989 patent from prior art. Specifically, Examiner Boucher stated that the '989 patent could issue only because "Young fails to teach a pin coupled through the house which extends into the security slot *after* the slot engagement member is in the locked position." Defendants' Mot. for Summary Judgment, Exh. C, at 16 (emphasis added). Thus, Examiner Boucher clearly believed that the fact that the pin was inserted into the slot only after the member was in the locked position was crucial to the patentability of the invention. The fact that she did not reach such a conclusion until considering the Young patent indicates that she believed the Young patent required limitations

1 in the '989 patent that the Schneider patent did not.

2 This view of the different import of the Schneider and the Young patents is supported to some degree by the actions of subsequent Examiner Barrett. She was not provided with the Young patent, or with the prosecution history of the '989 patent. She was presented with the Schneider patent, and after considering it determined that "[t]here is no teaching or suggestion in the prior art of record to locate the pin within the slot along with the locking member." Defendants' Mot. for Summary Judgment, Exh. K., at 4. Thus, she failed to find that Schneider required the same restrictions on the proposed invention that Examiner Boucher found the Young patent required. If the Young patent was truly cumulative to the Schneider patent, one would not expect the patent examiners to reach such different conclusions regarding their impact on the scope of the claimed invention.

Based on the above, the Court finds that the Young patent, and the role it played in the prosecution of the '989 patent, was not cumulative of the Schneider patent. Because Kensington asserted the patentability of claims that lack any temporal limitation on the placement of the pin in the slot, the Court further finds that withheld information was "inconsistent with a position [Kensington took] in asserting an argument of patentability." *See* 37 C.F.R. § 156(b) (2004).

Thus, the Court finds that the omission of the Young patent and its impact on the scope of the '989 patent was material.

### B. Intent

While intent is an issue of fact and must be proven by clear and convincing evidence, "[d]irect evidence of intent or proof of deliberate scheming is rarely available in instances of inequitable conduct." *Critikon*, 120 F.3d at 1256. Intent may therefore be "inferred from the surrounding circumstances." *Id.* It is insufficient, however, to infer intent "solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1289 (Fed. Cir. 2002). Indeed, the threshold for intent is high: "Our cases . . . have made clear that a finding of gross negligence does not, by itself, establish the intent threshold." *Ulead Sys.*, 351 F.3d at 1146. While a close question, the Court finds that defendants have not established that there is no genuine issue of material fact

11

concerning whether plaintiff acted with the intent to deceive the PTO.

Neither party presented any testimony from any of the individuals involved in prosecuting the '794 patent.[8] However, defendants produced a wide variety of circumstantial evidence in support of their motion. Defendants have established that plaintiff was aware of the Young patent during its prosecution of the '794 patent and that plaintiff did not disclose it, or its role in the prosecution history of the '989 patent. Also undisputed is the fact that during prosecution of the '794 patent plaintiff swamped the PTO with prior art – almost 200 references.[9] Among these references were five patents that had been used to challenge the validity of the '989 patent in earlier litigation. The only patent raised in that litigation that was not disclosed in the prosecution of the '794 patent was the Young patent. These facts create a strong inference of intent to deceive the PTO.

However, to prevail on summary judgment defendants must disprove the reason plaintiff has used to justify its failure to disclose the Young patent. The Court finds that this justification, though tenuous, is sufficient to raise a genuine issue of material fact as to intent.

Plaintiff argues in its papers that Young is not material, is not inconsistent with any of plaintiff's arguments during prosecution of the '794 patent, and is merely cumulative. This Court has rejected these arguments, as matters of fact. The arguments themselves, however, do bear on plaintiff's intent. The evidence strongly suggests that plaintiff believes Examiner Boucher was incorrect in her interpretation of the Young patent's import. A number of events in this case confirm that this was plaintiff's position. For example, in Kensington's opposition to plaintiff's motion to change venue to this Court from the Eastern District of Texas, Kensington argued that the Young patent was "not relevant to the patentability of the claims in the '794 patent." Defendants' Motion for Summary Judgment, Exh. Q, at 3 n.1. More recently, Kensington's briefs on the instant motion and its presentation at oral argument revealed that it continues to believe that Examiner Boucher was incorrect. The Federal Circuit did not finally reject plaintiff's position until it issued its opinion almost six months after the '794 patent issued.

---

[8] At oral argument, the Court asked counsel for plaintiff why the individuals prosecuting the '794 patent had not disclosed the Young reference to the new examiner. He stated that he did not know because he had not asked.

[9] By contrast, about 59 references were cited for the '989 patent.

12

It may well be that in any event Kensington should have taken its argument to the new patent examiner, rather than unilaterally deciding that it need not disclose the Young patent because Examiner Boucher was wrong. However, given that intent is a question of fact that must be proved by clear and convincing evidence, the Court cannot, on the record before it, find that there is no genuine issue of material fact with regard to plaintiff's intent to deceive the PTO. The Court therefore DENIES defendants' motion for summary judgment.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendants' motion for summary judgment of inequitable conduct and unenforceability (docket # 24). The Court DENIES plaintiff's motion for summary adjudication on infringement (docket # 23) without prejudice to further consideration after claim construction is completed in this case.

The Court VACATES the claim construction hearing, currently scheduled for September 20, 2005, and reschedules it for November 18, 2005. The parties are ordered to submit claim construction papers regarding only the terms "maintaining said locked configuration by use of a pin" and "wherein said pin extends into said security slot." The briefs are due as follows:

| | |
|---|---|
| Parties exchange preliminary claim construction and extrinsic evidence: | September 30, 2005 |
| Parties file their Joint Claim Construction and Prehearing Statement: | October 10, 2005 |
| Plaintiff's opening claim construction brief: | October 21, 2005 |
| Defendants' opposing claim construction brief: | November 4, 2005 |
| Plaintiff's reply brief: | November 11, 2005 |
| Claim construction hearing: | November 18, 2005 at 9:00 a.m. |

Dated: September 20, 2005

SUSAN ILLSTON
United States District Judge

13